IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF VERMONT, | ) ) ) ) ) |
| *Plaintiffs,* | ) Case No. ) ) |
| v. | ) ) Filed: |
| VERIZON COMMUNICATIONS INC. and RURAL CELLULAR CORPORATION, | ) ) ) |
| *Defendants.* | ) ) |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I. Nature and Purpose of the Proceeding

Defendants entered into an Agreement and Plan of Merger dated July 29, 2007, pursuant to which Verizon Communications Inc. ("Verizon") will acquire Rural Cellular Corporation ("RCC"). Plaintiffs United States and the State of Vermont filed a civil antitrust Complaint on June 10, 2008 seeking to enjoin the proposed acquisition. The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially for mobile wireless telecommunications services throughout Vermont, one geographic area in New York that is contiguous to Vermont, and in northeast Washington, in violation of Section 7 of the Clayton

Act, 15 U.S.C. § 18. This loss of competition would result in consumers facing higher prices, lower quality service and fewer choices of mobile wireless telecommunications services.

At the same time the Complaint was filed, plaintiffs also filed a Preservation of Assets Stipulation and Order and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, defendants are required to divest RCC's mobile wireless telecommunications services businesses and related assets throughout Vermont, one geographic area in New York that is contiguous to Vermont, and in northeast Washington ("Divestiture Assets"). Under the terms of the Preservation of Assets Order, defendants will take certain steps to ensure that during the pendency of the ordered divestiture: (a) the Divestiture Assets are preserved and operated as competitively independent, economically viable and ongoing businesses; (b) the Divestiture Assets are operated independently and without influence by defendants; and (c) competition is maintained.

Plaintiffs and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof. Defendants have also stipulated that they will comply with the terms of the Preservation of Assets Stipulation and Order and the proposed Final Judgment from the date of signing of the Preservation of Assets Stipulation and Order, pending entry of the proposed Final Judgment by the Court and the required divestitures. Should the Court decline to enter the proposed Final Judgment, defendants

have also committed to continue to abide by its requirements and those of the Preservation of Assets Stipulation and Order until the expiration of time for appeal.

## II. Description of the Events Giving Rise to the Alleged Violation

### A. The Defendants and the Proposed Transaction

Verizon, with headquarters in New York, is a corporation organized and existing under the laws of the state of Delaware. Verizon is one of the world's largest providers of communications services. Verizon is the second largest mobile wireless telecommunications services provider in the United States as measured by subscribers, provides mobile wireless telecommunications services in 49 states, and serves in excess of 65 million subscribers. In 2007, Verizon earned mobile wireless telecommunications services revenues of approximately $43 billion.

RCC, with headquarters in Alexandria, Minnesota, is a corporation organized and existing under the laws of the state of Minnesota. RCC is the 10th largest mobile wireless telecommunications services provider in the United States, as measured by subscribers and provides mobile wireless telecommunications services in 15 states. It has approximately 790,000 subscribers. In 2007, RCC earned approximately $635.3 million in revenues.

Pursuant to an Agreement and Plan of Merger dated July 29, 2007, Verizon will acquire RCC for approximately $2.67 billion. If this transaction is consummated, Verizon and RCC combined would have approximately 66 million subscribers in the United States, with $44 billion in mobile wireless telecommunications services revenues. The proposed transaction, as initially agreed to by defendants, would lessen competition substantially for mobile wireless telecommunications services throughout Vermont, one geographic area in New York that is

3

contiguous to Vermont, and in northeast Washington. This acquisition is the subject of the Complaint and proposed Final Judgment filed by plaintiffs.

## B. Mobile Wireless Telecommunications Services Industry

Mobile wireless telecommunications services allow customers to make and receive telephone calls and obtain data services using radio transmissions without being confined to a small area during the call or data session, and without the need for unobstructed line-of-sight to the radio tower. Mobility is highly valued by customers, as demonstrated by the more than 255 million people in the United States who own mobile wireless telephones. In 2007, revenues from the sale of mobile wireless telecommunications services in the United States were over $138 billion. To meet this desire for mobility, mobile wireless telecommunications services providers must deploy extensive networks of switches and radio transmitters and receivers and interconnect their networks with the networks of wireline carriers and other mobile wireless telecommunications services providers.

In the early to mid-1980s, the FCC issued two cellular licenses (A-block and B-block) in each Metropolitan Statistical Area ("MSA") and Rural Service Area ("RSA") (collectively, "Cellular Marketing Areas" or "CMAs"), with a total of 734 CMAs covering the entire United States. Each license consists of 25 MHz of spectrum in the 800 MHz band. The first mobile wireless voice systems using this cellular spectrum were based on analog technology, now referred to as first-generation or "1G" technology.

In 1995, the FCC licensed additional spectrum for the provision of Personal Communications Services ("PCS"), a category of services that includes mobile wireless telecommunications services comparable to those offered by cellular licensees. These licenses

are in the 1900 MHz band and are divided into six blocks: A, B, and C, which consist of 30 MHz each; and D, E, and F, which consist of 10 MHz each. Geographically, the A and B-block 30 MHz licenses are issued by Major Trading Areas ("MTAs"). C, D, E, and F-block licenses are issued by Basic Trading Areas ("BTAs"), several of which comprise each MTA. MTAs and BTAs do not generally correspond to MSAs and RSAs.

With the introduction of the PCS licenses, both cellular and PCS licensees began offering digital services, thereby increasing network capacity, shrinking handsets, and extending battery life. In addition, in 1996, one provider, a specialized mobile radio ("SMR" or "dispatch") spectrum licensee, began to use its SMR spectrum to offer mobile wireless telecommunications services comparable to those offered by other mobile wireless telecommunications services providers, in conjunction with its dispatch, or "push-to-talk," service. Although there are a number of providers holding spectrum licenses in each area of the country, not all providers have fully built out their networks throughout each license area. In particular, because of the characteristics of PCS spectrum, providers holding this type of spectrum generally have found it less attractive to build out in rural areas.

Today, more than 95 percent of the total U.S. population lives in counties where three or more mobile wireless telecommunications services operators offer service. Nearly all mobile wireless voice services have migrated to second-generation or "2G" digital technologies, GSM (global standard for mobility), and CDMA (code division multiple access). Even more advanced technologies ("2.5G" and "3G"), based on the earlier 2G technologies, have been deployed for mobile wireless data services. Additionally, during the past two years, the FCC has auctioned off additional spectrum that can be used to support mobile wireless telecommunications services,

including Advanced Wireless Spectrum (1710-1755 MHz and 2110-2155 MHz bands ) and 700

MHz band spectrum, although it will be several years before mobile wireless telecommunications

services based on this spectrum are widely deployed.

### C.     The Competitive Effects of the Transaction on Mobile Wireless Telecommunications Services

Mobile wireless telecommunications services include both voice and data services

provided over a radio network and allow customers to maintain their telephone calls or data

sessions without wires when traveling.  There are no cost-effective alternatives to mobile

wireless telecommunications services.  Because fixed wireless services are not mobile, they are

not regarded by consumers of mobile wireless telecommunications services to be a reasonable

substitute for those services.  It is unlikely that a sufficient number of customers would switch

away from mobile wireless telecommunications services to make a small but significant price

increase in those services unprofitable.

The United States comprises numerous local geographic markets for mobile wireless

telecommunications services.[1]  A large majority of customers use mobile wireless

telecommunications services in close proximity to their workplaces and homes.  Thus, customers

purchasing mobile wireless telecommunications services choose among mobile wireless

telecommunications services providers that offer services where they live, work, and travel on a

regular basis.  The geographic areas in which the FCC has licensed mobile wireless

telecommunications services providers often represent the core of the business and social sphere

within which customers have the same competitive choices for mobile wireless telephone

---

[1]The existence of local markets does not, of course, preclude the possibility of
competitive effects in a broader geographic area, such as a regional or national area.

6

services.  The number and identity of mobile wireless telecommunications services providers

varies among geographic areas, as does the quality of services and breadth of geographic

coverage offered by providers.  Some mobile wireless telecommunications services providers can

and do offer different promotions, discounts, calling plans, and equipment subsidies in different

geographic areas, varying the price for customers by geographic area.

The relevant geographic markets, under Section 7 of the Clayton Act, 15 U.S.C. §18,

where the transaction will substantially lessen competition for mobile wireless

telecommunications services are effectively represented by the following FCC spectrum

licensing areas: Burlington, Vermont (CMA 248); New York RSA-2 (CMA 560); Vermont

RSA-1 (CMA 679); Vermont RSA-2 (CMA 680); Washington RSA-2 (CMA 694); and

Washington RSA-3 (CMA 695).  It is unlikely that a sufficient number of customers would

switch to mobile wireless telecommunications services providers who do not offer services in

these geographic areas to make a small but significant price increase in the relevant geographic

markets unprofitable.

These geographic areas of concern for mobile wireless telecommunications services were

identified via a fact-specific, market-by-market analysis that included consideration of, but was

not limited to, the following factors:  the number of mobile wireless telecommunications services

providers and their competitive strengths and weaknesses; Verizon's and RCC's market shares,

along with those of the other providers; whether additional spectrum is, or is likely soon to be,

available; whether any providers are limited by insufficient spectrum or other factors in their

ability to add new customers; the concentration of the market, and the breadth and depth of

coverage by different providers in each area and in the surrounding area; and the likelihood that any provider would expand its existing coverage or that new providers would enter.

In each of the cellular license areas described above, Verizon and RCC are the two largest carriers (based on subscribers), with a combined share in each area ranging from over 60% to nearly 94%, and are each other's closest competitor for a significant set of customers. In all but a portion of one of these cellular license areas, Verizon and RCC hold all of the cellular spectrum licenses. In a portion of the Vermont RSA 2 license area (consisting of Bennington and Windham counties, and the portion of Windsor County south of U.S. Route 4), Verizon does not own cellular spectrum, but it is a strong competitor because, unlike many other providers with PCS spectrum in rural areas, it has constructed a PCS network that covers a significant portion of the population, supplements that network with roaming on another carrier's cellular network and plans to substantially expand its own PCS network in the future. Thus, even in that area, Verizon and RCC are the leading two competitors in terms of share. Taking into account the factors that potentially impact competition including coverage area, brand recognition, service quality and reputation, handset selection, and service features, Verizon and RCC are stronger competitors, and thus closer substitutes for each other for a significant set of customers, than the other cellular provider, and the other PCS providers, that serve this area.

The relevant geographic areas for mobile wireless services are also highly concentrated. As measured by the Herfindahl-Hirschman Index ("HHI"), which is commonly employed in merger analysis and is defined and explained in Appendix A to this Complaint, concentration in these areas ranges from over 2800 to more than 5100, which is well above the 1800 threshold at which plaintiffs consider a market to be highly concentrated. After Verizon's proposed

8

acquisition of RCC is consummated, the HHIs in the relevant geographic areas will range from over 4900 to over 8700, with increases in the HHI as a result of the merger ranging from over 1200 to over 4200, significantly beyond the thresholds at which plaintiffs consider a transaction likely to cause competitive harm.

Competition between Verizon and RCC in the relevant geographic areas has resulted in lower prices and higher quality in mobile wireless telecommunications services than would otherwise have existed in these geographic areas. If Verizon's proposed acquisition of RCC is consummated, the competition between Verizon and RCC in mobile wireless telecommunications services will be eliminated in these areas and the relevant geographic areas for mobile wireless telecommunications services will become substantially more concentrated. As a result, the loss of competition between Verizon and RCC increases the merged firm's incentive and ability in the relevant geographic markets to increase prices, diminish the quality or quantity of services provided, and refrain from or delay making investments in network improvements.

Entry by a new mobile wireless services provider in the relevant geographic areas would be difficult, time-consuming, and expensive, requiring spectrum licenses and the build out of a network. Therefore, any entry in response to a small but significant price increase for mobile wireless telecommunications services by the merged firm in these relevant geographic areas would not be timely, likely, or sufficient to thwart the competitive harm resulting from Verizon's proposed acquisition of RCC, if it were to be consummated.

For these reasons, plaintiffs concluded that Verizon's proposed acquisition of RCC will likely substantially lessen competition, in violation of Section 7 of the Clayton Act, in the

provision of mobile wireless telecommunications services in the relevant geographic areas alleged in the Complaint.

### III. Explanation of the Proposed Final Judgment

The divestiture requirements of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in mobile wireless telecommunications services in the geographic areas of concern. The proposed Final Judgment requires defendants, within one hundred twenty (120) days after the consummation of the Transaction, or five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest the Divestiture Assets. The Divestiture Assets are essentially RCC's entire mobile wireless telecommunications services businesses in the geographic areas described herein where Verizon and RCC are each other's closest competitors for mobile wireless telecommunications services. These assets must be divested in such a way as to satisfy plaintiff United States, (and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont), in its sole discretion that the assets will be operated by the purchaser as a viable, ongoing business that can compete effectively in each relevant area. Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective purchasers.

The proposed Final Judgment requires that a single purchaser acquire the Divestiture Assets in New York and Vermont, and a single purchaser acquire the Divestiture Assets in Washington. This will allow the purchaser of these assets to supply service to customers that require mobile wireless telecommunications services throughout each of these areas in the same way that RCC is currently able to provide that service. This provision resolves concerns about the loss of

competition for customers that demand coverage over a combination of FCC licensing areas, in addition to the concerns due to eliminating competition within each licensing area.

Under limited circumstances, defendants are permitted to retain specified portions of RCC's mobile wireless assets in the relevant geographic areas. First, plaintiffs are not requiring the divestiture of the PCS spectrum held by RCC in the RSAs being divested. In requiring the divestitures, plaintiffs seek to make certain that the potential buyer acquires all the assets it may need to be a viable competitor and replace the competition lost by the merger. The 25 MHz of cellular spectrum that must be divested is typically sufficient to support the operation and expansion of the mobile wireless telecommunications services businesses being divested, enabling the buyer to be a viable competitor to the merged entity. Similarly, defendants are not required to divest CDMA equipment on the Mt. Stratton, Vermont tower or the CDMA, TDMA, and analog equipment on the Woodstock, Vermont tower, although they will be required to divest the GSM equipment located on these towers. The CDMA, TDMA and analog equipment located on these towers is not part of the GSM network being divested and therefore is not essential to the operations of the divested business. The Acquirer will receive the GSM network assets it will need to operate effectively in this area. Third, defendant Verizon may retain defendant RCC's Colchester, Vermont switches (an Ericsson AXE 810 and a Lucent 5E). Verizon needs the Ericsson switch to provide service to RCC's GSM customers Verizon is acquiring in Maine and New Hampshire, where Verizon currently has only a CDMA network. It also needs the Lucent switch to support CDMA, TDMA, and analog services used predominantly by roaming customers in Massachusetts, New Hampshire, New York, and Vermont. A potential acquirer of the Divestiture Assets, which include RCC's GSM network, will either already have, or will be able to

quickly obtain, GSM switching capability and will not need TDMA or analog switching to support the divested business.

Additionally, in two instances, defendants may seek approval to retain certain spectrum in Vermont. First, in the Burlington MSA, the merged firm wants to retain RCC's PCS spectrum to insure that it has sufficient spectrum to support its wireless telecommunications services. Depending on the identity of the Acquirer, it may not need this additional PCS spectrum to be an effective competitor. Once an Acquirer is presented for approval, plaintiff United States, in its sole discretion upon consultation with Vermont, will determine whether the proposed Acquirer needs the PCS spectrum to insure it can operate a competitive business with Divestiture Assets its receives and whether allowing defendants to keep the cellular spectrum is consistent with the purposes of the Final Judgment. Second, for the portion of Vermont RSA 2 where Verizon does not own the cellular license, defendants are concerned that they will be unable to promptly roll out wireless broadband services to the citizens of Vermont if they cannot retain any of RCC's cellular spectrum in this area. Once an Acquirer is identified, plaintiff United States, in its sole discretion upon consultation with Vermont, will determine whether Verizon should be allowed substitute 10 MHz of RCC's cellular spectrum for the 10 MHz of PCS spectrum it would otherwise retain.

### A. Timing of Divestitures

In antitrust cases involving mergers or joint ventures in which the United States seeks a divestiture remedy, it requires completion of the divestitures within the shortest time period reasonable under the circumstances. Section IV.A.g of the proposed Final Judgment in this case requires divestiture of the Divestiture Assets, within one hundred twenty (120) days after the consummation of the Transaction, or five (5) days after notice of the entry of the Final Judgment

by the Court, whichever is later. Plaintiff United States in its sole discretion, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, may extend the date for divestiture of the Divestiture Assets by up to sixty (60) days. Because the FCC's approval is required for the transfer of the wireless licenses to a purchaser, Section IV.A provides that if applications for transfer of a wireless license have been filed with the FCC, but the FCC has not acted dispositively before the end of the required divestiture period, the period for divestiture of those assets shall be extended until five (5) days after the FCC has acted. This extension is to be applied only to the individual Divestiture Assets affected by the delay in approval of the license transfer and does not entitle defendants to delay the divestiture of any other Divestiture Assets for which license transfer approval is not required or has been granted.

The divestiture timing provisions of the proposed Final Judgment will ensure that the divestitures are carried out in a timely manner, and at the same time will permit defendants an adequate opportunity to accomplish the divestitures through a fair and orderly process. Even if all Divestiture Assets have not been divested upon consummation of the transaction, there should be no adverse impact on competition given the limited duration of the period of common ownership and the detailed requirements of the Preservation of Assets Stipulation and Order.

**B. Use of a Management Trustee**

The Preservation of Assets Stipulation and Order, filed simultaneously with this Competitive Impact Statement, ensures that, prior to divestiture, the Divestiture Assets remain an ongoing business concern. The Preservation of Assets Stipulation and Order is designed to ensure that the Divestiture Assets will be preserved and remain independent of defendants, so that competition is maintained during the pendency of the ordered divestiture.

The Preservation of Assets Stipulation and Order provides for the appointment of a management trustee selected by plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, to oversee the Divestiture Assets. The appointment of a management trustee in this situation is required because the Divestiture Assets are not independent facilities that can be held separate and operated as stand-alone units by the merged firm. Rather, the Divestiture Assets are an integral part of a larger network and, to maintain their competitive viability and economic value, they should remain part of that network during the divestiture period. A management trustee will oversee the continuing relationship between defendants and these assets, to ensure that these assets are preserved and supported by defendants during this period, yet run independently. The management trustee will have the power to operate the Divestiture Assets in the ordinary course of business, so that they will remain independent and uninfluenced by defendants, and so that the Divestiture Assets are preserved and operated as an ongoing and economically viable competitor to defendants and to other mobile wireless telecommunications services providers. The management trustee will preserve the confidentiality of competitively sensitive marketing, pricing, and sales information; ensure defendants' compliance with the Preservation of Assets Stipulation and Order and the proposed Final Judgment; and maximize the value of the Divestiture Assets so as to permit expeditious divestiture in a manner consistent with the proposed Final Judgment.

The Preservation of Assets Stipulation and Order provides that defendants will pay all costs and expenses of the management trustee, including the cost of consultants, accountants, attorneys, and other representatives and assistants hired by the management trustee as are reasonably necessary to carry out his or her duties and responsibilities. After his or her appointment becomes

14

effective, the management trustee will file monthly reports with plaintiffs setting forth efforts taken to accomplish the goals of the Preservation of Assets Stipulation and Order and the proposed Final Judgment and the extent to which defendants are fulfilling their responsibilities. Finally, the management trustee may become the divestiture trustee, pursuant to the provisions of Section V of the proposed Final Judgment.

### C. Use of a Divestiture Trustee

In the event that defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, to effect the divestitures. As part of this divestiture, defendants must relinquish any direct or indirect financial ownership interests and any direct or indirect role in management or participation in control. Pursuant to Section V of the proposed Final Judgment, the divestiture trustee will own and control the Divestiture Assets until they are sold to a final purchaser, subject to safeguards to prevent defendants from influencing their operation.

Section V details the requirements for the establishment of the divestiture trust, the selection and compensation of the divestiture trustee, the responsibilities of the divestiture trustee in connection with the divestiture and operation of the Divestiture Assets, and the termination of the divestiture trust. The divestiture trustee will have the obligation and the sole responsibility, under Section V.D, for the divestiture of any transferred Divestiture Assets. The divestiture trustee has the authority to accomplish divestitures at the earliest possible time and "at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee." In addition,

to ensure that the divestiture trustee can promptly locate and divest to an acceptable purchaser, United States, in its sole discretion, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, may require defendants to include additional assets, or allow defendants to substitute substantially similar assets, which substantially relate to the Divestiture Assets to be divested by the divestiture trustee.

The divestiture trustee will not only have responsibility for sale of the Divestiture Assets, but will also be the authorized holder of the wireless licenses, with full responsibility for the operations, marketing, and sales of the wireless businesses to be divested, and will not be subject to any control or direction by defendants.  Defendants will no longer have any role in the ownership, operation, or management of the Divestiture Assets other than the right to receive the proceeds of the sale.  Defendants will also retain certain obligations to support to the Divestiture Assets and cooperate with the divestiture trustee in order to complete the divestiture.

The proposed Final Judgment provides that defendants will pay all costs and expenses of the divestiture trustee.  The divestiture trustee's commission will be structured, under Section V.G of the proposed Final Judgment, so as to provide an incentive for the divestiture trustee based on the price obtained and the speed with which the divestitures are accomplished.  After his or her appointment becomes effective, the divestiture trustee will file monthly reports with the Court and plaintiffs setting forth his or her efforts to accomplish the divestitures.  Section V.J requires the divestiture trustee to divest the Divestiture Assets to an acceptable purchaser or purchasers no later than six (6) months after the assets are transferred to the divestiture trustee.  At the end of six (6) months, if all divestitures have not been accomplished, the trustee and plaintiffs will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out

16

the purpose of the Final Judgment, including extending the trust or term of the trustee's appointment.

The divestiture provisions of the proposed Final Judgment will eliminate the anticompetitive effects of the transaction in the provision of mobile wireless telecommunications services. The divestitures of the Divestiture Assets will preserve competition in mobile wireless telecommunications services by maintaining an independent and economically viable competitor in the relevant geographic areas.

## IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against defendants.

## V. Procedures Available for Modification of the Proposed Final Judgment

The United States and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, which ever is later.  All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.  The comments and the response of plaintiff United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Nancy M. Goodman
> Chief, Telecommunications and Media Enforcement Section
> Antitrust Division, U.S. Department of Justice
> 1401 H Street, N.W., Suite 8000
> Washington, DC  20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.  Alternatives to the Proposed Final Judgment

Plaintiffs considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants.  Plaintiffs could have continued the litigation and sought preliminary and permanent injunctions against Verizon's acquisition of RCC.  Plaintiffs are satisfied, however, that the divestiture of assets and other relief described in the proposed Final Judgment will preserve competition for the provision of mobile wireless telecommunications services in the relevant areas identified in the Complaint.

18

## VII. <u>Standard of Review Under the APPA for the Proposed Final Judgment</u>

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

    A.    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

    B.    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reach of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995)*; see  generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 11 (D.D.C. 2007) (assessing the public interest standard under the Tunney Act).[2]

---

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 37, 40 (D.D.C. 2001).  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.  The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."*  More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d

---

[3] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have great flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to

"effectively redraft the complaint" to inquire into other matters that the United States did not

pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot

look beyond the complaint in making the public interest determination unless the complaint is

drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at

15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of

utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing

in this section shall be construed to require the court to conduct an evidentiary hearing or to require

the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2).  The language wrote into the statute

what the Congress that enacted the Tunney Act in 1974 intended, as Senator Tunney then

explained:  "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings

which might have the effect of vitiating the benefits of prompt and less costly settlement through

the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).  Rather,

the procedure for the public interest determination is left to the discretion of the court, with the

recognition that the court's "scope of review remains sharply proscribed by precedent and the

nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[4]

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973)("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

## VIII. <u>Determinative Documents</u>

There are no determinative materials or documents within the meaning of the APPA that were considered by plaintiff United States in formulating the proposed Final Judgment.

Dated: June 10, 2008

Respectfully submitted,

Hillary B. Burchuk (D.C. Bar No. 366755)
Lawrence M. Frankel (DC Bar No. 441532)
Jared A. Hughes
Deborah Roy (DC Bar No. 452573)

Attorneys, Telecommunications & Media
Enforcement Section
Antitrust Division

U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C.  20530
(202) 514-5621
Facsimile: (202) 514-6381

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF VERMONT, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. |
| v. | ) ) | Filed: |
| VERIZON COMMUNICATIONS INC. and RURAL CELLULAR CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

## PRESERVATION OF ASSETS STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

## I. DEFINITIONS

As used in this Preservation of Assets Stipulation and Order:

A.  "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

B.  "CMA" means cellular market area which is used by the Federal Communications Commission ("FCC") to define cellular license areas and which consists of Metropolitan Statistical Areas ("MSAs") and Rural Service Areas ("RSAs").

C.  "Divestiture Assets" means each mobile wireless telecommunications services business to be divested under this Final Judgment, including all types of assets, tangible and intangible, used by defendants in the operation of the mobile wireless telecommunications

services businesses to be divested. "Divestiture Assets" shall be construed broadly to accomplish the complete divestiture of the entire business of RCC in each of the following CMA license areas as required by this Final Judgment and to ensure that the divested mobile wireless telecommunications services businesses remain viable, ongoing businesses:

> (1) Burlington, VT MSA (CMA 248);
>
> (2) New York RSA 2 (CMA 560);
>
> (3) Vermont RSA 1 (CMA 679);
>
> (4) Vermont RSA 2 (CMA 680);
>
> (5) Washington RSA 2 (CMA 694); and
>
> (6) Washington RSA 3 (CMA 695)

provided that defendants may retain all of the PCS spectrum licenses RCC currently holds in each of these CMAs, except in the Burlington MSA, and equipment that is used only for wireless transmissions over this PCS spectrum. Defendants may also retain the Ericsson AXE 810 switch located in Colchester, VT used to support the GSM mobile wireless telecommunications services currently provided by RCC; the Lucent 5E switch located in Colchester, VT used to support CDMA, TDMA and analog mobile wireless telecommunications services currently provided by RCC; the CDMA, TDMA and analog equipment on the radio tower located at Woodstock (latitude 43.613975, longitude -72.52175) and any associated rights for this equipment to remain on this tower currently owned and held by RCC; and the CDMA equipment located on the radio tower located at Stratton (latitude 43.11344, longitude -72.90691) and any associated rights for this equipment to remain on this tower currently owned and held by RCC. In addition, defendants also (i) may retain in the Burlington MSA, RCC's PCS spectrum license, and (ii) in

2

the Vermont RSA 2-B2 service area, which includes Bennington and Windham counties, and the

portion of Windsor county south of U.S. Route 4, may substitute a license for 10 MHz of RCC's

cellular spectrum for RCC's 10 MHz PCS spectrum license, if approved by plaintiff United

States in its sole discretion, upon consultation with plaintiff Vermont.

The Divestiture Assets shall include, without limitation, all types of real and personal

property, monies and financial instruments, equipment, inventory, office furniture, fixed assets

and furnishings, supplies and materials, contracts, agreements, leases, commitments, spectrum

licenses issued by the FCC and all other licenses, permits and authorizations, operational support

systems, cell sites, network infrastructure, switches, customer support and billing systems,

interfaces with other service providers, business and customer records and information, customer

contracts, customer lists, credit records, accounts, and historic and current business plans which

relate primarily to the wireless businesses being divested, as well as any patents, licenses, sub-

licenses, trade secrets, know-how, drawings, blueprints, designs, technical and quality

specifications and protocols, quality assurance and control procedures, manuals and other

technical information defendant RCC supplies to its own employees, customers, suppliers,

agents, or licensees, and trademarks, trade names and service marks or other intellectual property,

including all intellectual property rights under third-party licenses that are capable of being

transferred to the Acquirer(s) either in their entirety, for assets described in (a) below, or through

a license obtained through or from RCC, for assets described in (b) below; provided that

defendants shall only be required to divest Multi-line Business Customer contracts if the primary

business address for that customer is located within any of the six license areas described herein,

and further, any subscriber who obtains mobile wireless telecommunications services through

any such contract retained by defendants and who are located within the six license areas

identified above, shall be given the option to terminate their relationship with defendants,

without financial cost, at any time within one year of the closing of the Transaction. Defendants

shall provide written notice to these subscribers within 45 days after the closing of the

Transaction of the option to terminate.

The divestiture of the Divestiture Assets shall be accomplished by:

(a)    transferring to the Acquirer(s) the complete ownership and/or other rights

to the assets (other than those assets used substantially in the operations of

RCC's overall wireless telecommunications services business which must

be retained to continue the existing operations of the wireless properties

that defendants are not required to divest, and that either are not capable of

being divided between the divested wireless telecommunications services

businesses and those not divested, or are assets that the defendants and the

Acquirer(s) agree, subject to the approval of plaintiff United States, shall

not be divided); and

(b)    granting to the Acquirer(s) an option to obtain a nonexclusive, transferable

license from defendants for a reasonable period, subject to the approval of

plaintiff United States, and at the election of the Acquirer(s), to use any of

RCC's retained assets under paragraph (a) above used in operating the

mobile wireless telecommunications services businesses being divested, so

as to enable the Acquirer(s) to continue to operate the divested mobile

wireless telecommunications services businesses without impairment.

4

Defendants shall identify in a schedule submitted to plaintiff United States and filed with the Court as expeditiously as possible following the filing of the Complaint, and in any event prior to any divestiture and before the approval by the Court of this Final Judgment, any and all intellectual property rights under third-party licenses that are used by the mobile wireless telecommunications services businesses being divested that defendants could not transfer to the Acquirer(s) entirely or by license without third-party consent, the specific reasons why such consent is necessary, and how such consent would be obtained for each asset.

D. "Multi-line Business Customer" means a corporate or business customer that contracts with RCC for mobile wireless telecommunications services to provide multiple telephones to its employees or members whose services are provided pursuant to a contract with the corporate or business customer.

E. "RCC" means defendant Rural Cellular Corporation, a Minnesota corporation with its headquarters in Alexandria, Minnesota, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

F. "Transaction" means the Agreement and Plan of Merger, dated July 29, 2007.

G. "Verizon" means defendant Verizon Communications Inc., a Delaware corporation, with its headquarters in New York, New York, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

## II. OBJECTIVES

The proposed Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Divestiture Assets for the purpose of preserving viable competitors in the provision of mobile wireless telecommunications services in order to remedy the effects that the plaintiffs allege would otherwise result from Verizon's acquisition of RCC. This Preservation of Assets Stipulation and Order ensures, prior to such divestitures, that competition is maintained during the pendency of the ordered divestitures, and that, if the Divestiture Assets are placed in a Management Trust, the Divestiture Assets remain ongoing business concerns and the Divestiture Assets remain economically viable. The Divestiture Assets will remain, as provided herein, preserved, independent and uninfluenced by defendants.

## III. JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this action and each of the parties hereto, and venue of this action is proper in the United States District Court for the District of Columbia. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## IV. COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A. The parties stipulate that a proposed Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that plaintiff United States has not withdrawn its consent, which it may do

at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B. Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment. Defendants shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C. Defendants shall not consummate the Transaction sought to be enjoined by the Complaint herein before (1) the Court has signed this Preservation of Assets Stipulation and Order and (2) one of the following conditions has been met:

(a) the Court has ruled on any Motion to Appoint a Management Trustee filed by plaintiff United States and 15 days have passed since the appointment of a Management Trustee, provided however that plaintiff United States, in its sole discretion, may waive or shorten the 15 day period if defendants have provided to the Management Trustee all information required by this Stipulation and that is necessary for the Management Trustee to successfully operate the Divestiture Assets; or

(b) defendants have entered into agreements, which will be consummated before or simultaneously with the consummation of the Transaction, to sell the Divestiture Assets in a manner consistent with the proposed Final Judgment to an Acquirer(s) acceptable to plaintiff United States in its sole discretion, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont and the Divestiture Assets are

7

transferred to the Acquirer(s) before or simultaneously with the consummation of the Transaction.

D. This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E. In the event (1) plaintiff United States has withdrawn its consent, as provided in Section IV.A above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

F. Defendants represent that the divestitures ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. <u>MANAGEMENT TRUSTEE</u>

A. If defendants have not satisfied Section IV.C(2)(b) of this Stipulation when this Stipulation is filed, the Court shall, upon application of plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, appoint a Management Trustee who will serve as manager of the Divestiture Assets until the Divestiture Assets are sold to an Acquirer(s) or transferred to a Divestiture Trustee pursuant to Section V of the proposed Final Judgment. Nothing in this Stipulation shall be interpreted to prevent the

8

Management Trustee from becoming the Divestiture Trustee pursuant to Section V of the proposed Final Judgment.

B. Prior to the closing of the Transaction, defendants shall enter into a trust agreement with the Management Trustee, subject to the approval of plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, in its sole discretion, that will grant the rights, powers, and authorities necessary to permit him to perform the duties and responsibilities of the Management Trustee pursuant to this Stipulation. The trust agreement shall enable the Management Trustee, on or before the date of the closing of the Transaction, to assume all rights, powers, and authorities necessary to perform his duties and responsibilities, pursuant to this Stipulation and the proposed Final Judgment and consistent with their purposes. Any appointed Management Trustee shall serve at the cost and expense of defendants, on such terms and conditions as plaintiff United States approves, with a fee arrangement that is reasonable in light of the person's experience and responsibilities.

C. The Management Trustee will have the following powers and responsibilities with respect to the Divestiture Assets:

(1) the Management Trustee will have the power to manage the Divestiture Assets in the ordinary course of business consistent with this Stipulation. Only with the prior written approval of plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, may the Management Trustee make any decision, take any action, or enter any transaction that is outside the ordinary course of business;

(2) the Management Trustee shall have a duty, consistent with the terms of this Stipulation and the proposed Final Judgment, to monitor the organization of the Divestiture

9

Assets; manage the Divestiture Assets in order to maximize their value so as to permit expeditious divestitures in a manner consistent with the proposed Final Judgment; maintain the independence of the Divestiture Assets from defendants; control and operate the Divestiture Assets to ensure that the Divestiture Assets remain an independent, ongoing, economically viable competitor to the other mobile wireless telecommunications services providers and assure defendants' compliance with their obligations pursuant to this Stipulation and the proposed Final Judgment;

(3) the Management Trustee shall have the authority to retain, at the cost and expense of defendants, such consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Management Trustee's duties and responsibilities;

(4) the Management Trustee and any consultants, accountants, attorneys, and any other persons retained by the Management Trustee, shall have full and complete access to all personnel, books, records, documents, and facilities of the Divestiture Assets or to any other relevant information as the Management Trustee may reasonably request, including, but not limited to, all documents and records kept in the normal course of business that relate to the Divestiture Assets. Defendants shall develop such financial or other information as the Management Trustee may reasonably request and shall cooperate with the Management Trustee. Defendants shall take no action to interfere with or impede the Management Trustee's ability to monitor defendants' compliance with this Stipulation and the proposed Final Judgment or otherwise to perform his duties and responsibilities consistent with the terms of this Stipulation and the proposed Final Judgment;

(5)  the Management Trustee will ensure that the Divestiture Assets shall be staffed with sufficient employees to maintain their viability and competitiveness.  To the extent that any employee whose principal responsibilities relate to the Divestiture Assets leaves or has left the Divestiture Assets prior to divestiture of the Divestiture Assets, the Management Trustee may replace departing or departed employees with persons who have similar experience and expertise or determine not to replace such departing or departed employees; and

(6)  30 days after the Management Trustee has been appointed by the Court, and thereafter on the 25th day of each month until the Divestiture Assets are either transferred to an Acquirer(s) or to the Divestiture Trustee, the Management Trustee shall report in writing to plaintiffs concerning the efforts to accomplish the purposes of this Stipulation and the proposed Final Judgment.  Included within that report shall be the Management Trustee's assessment of the extent to which the Divestiture Assets are meeting (or exceeding) their projected goals as are reflected in existing or revised operating plans, budgets, projections or any other regularly prepared financial statements and the extent to which defendants are fulfilling their responsibilities under this Stipulation and the proposed Final Judgment.

D.  The following limitations shall apply to the Management Trustee:

(1)  the Management Trustee shall not be involved, in any way, in the operations of the other businesses of defendants;

(2)  the Management Trustee shall have no financial interests affected by defendants' revenues, profits or profit margins, except that the Management Trustee's compensation for managing the Divestiture Assets may include economic incentives dependent on the financial performance of the Divestiture Assets provided that those incentives are

11

consistent with the objectives of this Stipulation and the proposed Final Judgment and are approved by plaintiff United States; and

(3) the Management Trustee shall be prohibited from performing any further work for defendants for one (1) year after the close of the divestiture transactions.

E. Defendants and the Management Trustee will take all reasonable efforts to preserve the confidentiality of information that is material to the operation of either the Divestiture Assets or defendants' businesses. Defendants' personnel supplying services to the Divestiture Assets pursuant to this Stipulation must retain and maintain the confidentiality of any and all confidential information material to the Divestiture Assets. Except as permitted by this Stipulation and the proposed Final Judgment, such persons shall be prohibited from providing, discussing, exchanging, circulating or otherwise furnishing the confidential information of the Divestiture Assets to or with any person whose employment involves any of defendants' businesses, except as necessary to fulfill the purposes of this Stipulation and the proposed Final Judgment.

F. If in the judgment of the Management Trustee, defendants fail to provide the services listed in Section VI of this Stipulation to the satisfaction of the Management Trustee, upon notification to defendants and approval by plaintiff United States, the Management Trustee may engage third parties unaffiliated with the defendants to provide those services for the Divestiture Assets, at the cost and expense of defendants, provided that defendants may have reasonable access to necessary information to satisfy themselves that after the services have been provided, the Divestiture Assets are in compliance with all applicable laws, rules, and regulations.

G. At the option of the Management Trustee, defendants may also provide other products and services on an arms-length basis, provided that the Management Trustee is not obligated to obtain any other product or service from defendants and may acquire any such products or services from third parties unaffiliated with defendants.

H. If the Management Trustee ceases to act or fails to act diligently and consistently with the purposes of this Stipulation and the proposed Final Judgment, if the Management Trustee proposed by plaintiff United States is not approved by this Court or resigns, or if for any other reason the Management Trustee ceases to serve in his or her capacity as Management Trustee, plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, may select a substitute Management Trustee. In this event, plaintiff United States will identify to defendants the individual or entity it proposes to select as Management Trustee. Defendants must make any objection to this selection within five (5) business days after the United States notifies defendants of the substitute Management Trustee's selection. Upon application of plaintiff United States, the Court shall approve and appoint a substitute Management Trustee. Within five (5) business days of such appointment, defendants shall enter into a trust agreement with the substitute Management Trustee subject to the approval of plaintiff United States in its sole discretion as described in Section V.B of this Stipulation.

## VI. PRESERVATION OF ASSETS

Until the divestitures required by the proposed Final Judgment have been accomplished, except as otherwise approved in advance in writing by plaintiff United States:

A. Defendants and the Management Trustee shall preserve, maintain, and continue to support the Divestiture Assets, take all steps necessary to manage the Divestiture Assets in order

to maximize their competitiveness, revenue, profitability and viability and to permit expeditious divestitures in a manner consistent with this Stipulation and the proposed Final Judgment.

B. The Divestiture Assets shall be operated by the Management Trustee as part of an independent, ongoing, economically viable and competitive business to other mobile wireless telecommunications services providers operating in the same license area and operated so that these assets are maintained or increased in value. Defendants and the Management Trustee shall take all steps necessary to ensure that:

(1) the management, sales, and operations of the Divestiture Assets are independent from defendants' other operations; provided however, that at the request of the Management Trustee, defendants shall include the marketing, pricing and sales of the mobile wireless telecommunications services generated by the Divestiture Assets in the license areas served by the Divestiture Assets within its marketing, promotional, and service offerings, in the ordinary course of business, in any national, regional, and local marketing programs. Nothing in this Section shall prohibit the Management Trustee from independently developing reasonable marketing, sales, pricing or promotional offers for the mobile wireless telecommunications services generated by the Divestiture Assets, which shall be funded and supported by defendants;

(2) the Divestiture Assets are maintained by adhering to normal and planned repair, capital improvement, upgrade and maintenance schedules or at a greater level if necessary to insure that the Divestiture Assets remain competitive;

(3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning marketing, pricing or sales of mobile wireless

14

telecommunications services generated by the Divestiture Assets will be kept separate and apart from defendants' other operations; and

   (4) the management of the Divestiture Assets acts to maintain and increase the sales and revenues of the Divestiture Assets, and maintain, at a minimum, at previously approved levels for 2007 or 2008, whichever are higher, all promotional, advertising, sales, marketing, and technical support for the Divestiture Assets.

  C. Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets nor shall defendants take any action that would influence or interfere with the ability of any Divestiture Trustee appointed pursuant to the proposed Final Judgment to operate and manage the Divestiture Assets or to complete the divestitures pursuant to the proposed Final Judgment to an Acquirer(s) acceptable to plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont.

  D. Defendants shall provide sufficient working capital and lines and sources of credit as deemed necessary by the Management Trustee to continue to maintain the Divestiture Assets consistent with this Stipulation.

  E. Unless otherwise agreed to by plaintiff United States in its sole discretion, defendants shall resolve all outstanding obligations related to the Divestiture Assets including but not limited to agent and employee compensation, vendors and landlords within thirty (30) days of closing the Transaction.

  F. Except (1) as recommended by the Management Trustee and approved by plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, or (2) as part of a divestiture approved by plaintiff United States in accordance

15

with the terms of the proposed Final Judgment, defendants shall not remove, sell, lease, assign, transfer, pledge or otherwise dispose of any of the Divestiture Assets outside the ordinary course of business.

G. The Management Trustee, with defendants' cooperation consistent with this Stipulation and the proposed Final Judgment, shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of the Divestiture Assets. As part of defendants' cooperation:

(1) prior to the closing of the Transaction, defendants will notify plaintiffs in writing of the steps defendants have taken to comply with this Section.  If the Transaction has not closed within seven (7) days after the filing of the Complaint, on that day defendants will submit to plaintiffs a detailed statement of how defendants will comply with Section VI.A prior to the closing of the Transaction, including but not limited to: (a) marketing plans for the sale of mobile wireless telecommunications services by the mobile wireless businesses to be divested, including customer retention plans and promotions; (b) the designation of a management team who will have responsibility for and manage the Divestiture Assets prior to the closing of the Transaction, identifying any changes from pre-filing staffing; (c) plans for retention of employees and payment of retention bonuses to employees whose primary duties related to the mobile wireless businesses to be divested;  and (d) plans for network maintenance, repair improvements, and upgrades of the Divestiture Assets;

16

(2) at least 15 days prior to the closing of the Transaction, unless such time is waived or shortened by plaintiff United States, defendants will provide to the Management Trustee and plaintiffs, for (i) Burlington VT MSA (CMA 248); (ii) Vermont RSA 1 (CMA 679) and Vermont RSA 2 (CMA 680); (iii) New York RSA 2 (CMA 560) and (iv) Washington RSA 2 (CMA 694) and Washington RSA 3 (CMA 695), a separate financial report for each of these divested geographic areas, and detailed management reports describing existing and future plans for human resources, marketing, network upgrades and capital expenditures in each divestiture market, and the extent to which each plan or project has been completed.  Defendants will produce these reports in a form and with content that is acceptable to the Management Trustee and the United States; and

(3) at least 15 days prior to the closing of the Transaction, unless such time is waived or shortened by plaintiff United States, defendants will provide all reports regularly prepared by defendant RCC that measure sales activity for (i) Burlington VT MSA (CMA 248); (ii) Vermont RSA 1 (CMA 679) and Vermont RSA 2 (CMA 680); (iii) New York RSA 2 (CMA 560) and (iv) Washington RSA 2 (CMA 694) and Washington RSA 3 (CMA 695) that are in a form and with content acceptable to the Management Trustee and plaintiff United States.

H.  If a Management Trustee has been appointed by the Court, 15 days prior to the closing of the Transaction, defendants shall identify, by name and title, to the Management Trustee and plaintiff United States, sufficient employees for each of the Divestiture Assets who are familiar with and have had responsibility for the management, operation, marketing, and sales of the Divestiture Assets, to assist the Management Trustee with his duties and responsibilities hereunder.  No later than 7 days prior to the closing of the Transaction, upon approval of the

Management Trustee and plaintiff United States, defendants shall appoint sufficient employees for each of the Divestiture Assets who are familiar with and have had responsibility for the management, operation, marketing, and sales of the Divestiture Assets, to assist the Management Trustee with his duties and responsibilities hereunder. Defendants may offer a bonus or severance to employees whose primary employment responsibilities relate to the Divestiture Assets, that continue their employment until divestiture (in addition to any other bonus or severance to which the employees would otherwise be entitled).

     I.     Until the Transaction is consummated, defendant RCC will operate the Divestiture Assets in the same fully competitive manner as its other mobile wireless services businesses and defendant Verizon will not influence or attempt to influence the operation of the Divestiture Assets pending their divestiture. Following consummation of the Transaction, except for employees (1) whose primary employment responsibilities relate to the Divestiture Assets, or (2) who are involved in providing support services to the Divestiture Assets pursuant to Sections V and VI of this Stipulation and Section V of the proposed Final Judgment, defendants shall not permit any other of their employees, officers, agents, or directors to be involved in the operations of the Divestiture Assets, including but not limited to decision making concerning marketing, pricing or sales of mobile wireless telecommunications services generated by the Divestiture Assets.

     J. Except as required by law in the course of (1) complying with this Stipulation and the proposed Final Judgment; (2) overseeing compliance with policies and standards concerning the safety, health, and environmental aspects of the operations of the Divestiture Assets and the integrity of their financial controls; (3) defending legal claims, investigations or enforcement

actions threatened or brought against the Divestiture Assets; or (4) obtaining legal advice, defendants' employees (excluding employees (a) whose primary employment responsibilities relate to the Divestiture Assets, or (b) who are involved in providing support services to the Divestiture Assets pursuant to Sections V and VI of this Stipulation and Section V of the proposed Final Judgment) shall not receive, or have access to, or use any material confidential information, not in the public domain, of the Divestiture Assets. Defendants may receive aggregate financial information relating to the Divestiture Assets to the extent necessary to allow defendants to prepare the defendants' consolidated financial reports, tax returns, reports required by securities laws, and personnel reports. Any such information that is obtained pursuant to this subparagraph shall be used only for the purposes set forth in this subparagraph.

K. Until the Divestiture Assets are divested to an Acquirer(s) acceptable to plaintiff United States pursuant to the Final Judgment, defendants shall provide to the Divestiture Assets, at no cost, support services needed to maintain the Divestiture Assets in the ordinary course of business, including but not limited to:

(1) federal and state regulatory policy development and compliance;

(2) human resources administrative services;

(3) environmental, health and safety services, and developing corporate policies and insuring compliance with federal and state regulations and corporate policies;

(4) preparation of tax returns;

(5) financial accounting and reporting services;

(6) audit services;

19

(7) legal services;

(8) routine network maintenance, repair, improvements, and upgrades;

(9) switching, call completion, and other services necessary to allow subscribers to use mobile wireless services and complete calls;

(10) billing, customer care and customer service related functions necessary to maintain the subscriber account and relationship;

(11) for each retail and indirect sales outlet, a sixty (60) day supply of inventory, including both handsets and accessories, branded as directed by the Management Trustee, based on each outlet's average sales for the prior two (2) months, and if the Management Trustee requests, RCC shall make available in sufficient quantities, branded as directed by the Management Trustee, handsets and accessories, introduced by RCC in similar markets that are compatible with the network in the two divestiture markets;

(12) the individual financial reports described in Section VI.F shall be provided on a monthly basis; and

(13) the sales reports described in Section VI.G shall be provided on a daily basis.

## VII. DURATION OF ASSET PRESERVATION OBLIGATIONS

Defendants' obligations under this Preservation of Assets Stipulation and Order shall remain in effect until (1) consummation of the divestitures required by the proposed Final Judgment or (2) until further order of the Court. If the United States voluntarily dismisses the

Complaint in this matter, Defendants are released from all further obligations under this

Preservation of Assets Stipulation and Order.

Dated: June 10, 2008

Respectfully submitted,

FOR PLAINTIFF UNITED STATES

*Hillary B. Burchuk*

Hillary B. Burchuk (D.C. Bar No. 366755)
Lawrence M. Frankel (D.C. Bar No. 441532)
Deborah Roy (D.C. Bar No. 452573)
Attorneys, Telecommunications & Media
Enforcement Section
Antitrust Division

U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C.  20530
(202) 514-5621
Facsimile: (202) 514-6381

FOR DEFENDANT VERIZON
COMMUNICATIONS INC.

*David E. Wheeler*

John Thorne (D.C. Bar No. 421351)
Senior Vice President and Deputy
  General Counsel
David E. Wheeler (D.C. Bar No. 473404)
Vice President and Associate
  General Counsel

Verizon Communications Inc.
1515 N. Courthouse Road
Suite 500
Arlington, VA 22201-2909
(703) 351-3900
Facsimile (703) 351-3656

FOR DEFENDANT RURAL CELLULAR
CORPORATION

*Michael L. Weiner*

Michael L. Weiner
Brian C. Mohr (D.C. Bar No. 385983)
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-2632
Facsimile: (917) 777-2632

STATE OF VERMONT
WILLIAM H. SORRELL
Vermont Attorney General

Julie Brill
Assistant Attorney General and
Director, Antitrust

Jennifer Giaimo
Assistant Attorney General

Office of the Vermont Attorney General
109 State Street
Montpelier, Vermont  05609-1001
(802) 828-3658
Facsimile: (802) 828-2154

O R D E R

IT IS SO ORDERED by the Court, this ___ day of _____, 2008.

_____
United States District Judge

22

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF VERMONT, | ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | Filed: |
| VERIZON COMMUNICATIONS INC. and RURAL CELLULAR CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF UNITED STATES' EXPLANATION
OF CONSENT DECREE PROCEDURES**

Plaintiff United States submits this short memorandum summarizing the procedures regarding the Court's entry of the proposed Final Judgment. This Judgment would settle this case pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)-(h) (the "APPA"), which applies to civil antitrust cases brought and settled by the United States.

1. Today, plaintiffs United States and Vermont have filed a Complaint, proposed Final Judgment, and Preservation of Assets Stipulation and Order, between the parties by which they have agreed that the Court may enter the proposed Final Judgment following compliance with the APPA. Plaintiff United States has also filed a Competitive Impact Statement relating to the proposed Final Judgment.

2. The APPA requires that plaintiff United States publish the proposed Final Judgment and the Competitive Impact Statement in the *Federal Register* and in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment. The notice

will inform members of the public that they may submit comments about the proposed Final

Judgment to the United States Department of Justice, Antitrust Division (*see* 15 U.S.C. §§ 16(b)-

(c)).

     3.     During the sixty-day period, plaintiff United States will consider, and at the close

of that period respond to, any comments that it has received, and it will publish the comments

and plaintiff United States' responses in the *Federal Register*.

     4.     After the expiration of the sixty-day period, plaintiff United States will file with the

Court the comments and plaintiff United States' responses, and it may ask the Court to enter the

proposed Final Judgment (unless plaintiffs have decided to withdraw their consent to entry of the

Judgment, as permitted by Section IV.A of the Preservation of Assets Stipulation and Order) (*see*

15 U.S.C. § 16(d)).

     5.     After compliance with the APPA, 15 U.S.C. §§ 16(e)-(f), the Court may enter the

proposed Final Judgment without a hearing, provided that it concludes that the Final Judgment is

in the public interest and that the United States has not withdrawn its consent.

Dated: June 10, 2008               Respectfully submitted,

                                      FOR PLAINTIFF UNITED STATES:

                                      Hillary B. Burchuk (DC Bar No. 366755)
Lawrence M. Frankel (DC Bar No. 441532)
Jared A. Hughes
Deborah Roy (DC Bar No. 452573)
Attorneys, Telecommunications & Media
Enforcement Section
U.S. Department of Justice, Antitrust Division
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C.  20530
(202) 514-5621
Facsimile:  (202) 514-6381

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF VERMONT, | ) ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | Filed: |
| VERIZON COMMUNICATIONS INC. and RURAL CELLULAR CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

## FINAL JUDGMENT

WHEREAS, plaintiffs, United States of America and the State of Vermont, filed their Complaint on June 10, 2008, plaintiffs and defendants, Verizon Communications Inc. ("Verizon") and Rural Cellular Corporation ("RCC"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by defendants to assure that competition is not substantially lessened;

AND WHEREAS, plaintiffs require defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to plaintiffs that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. Definitions

As used in this Final Judgment:

A. "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

B. "CMA" means cellular market area which is used by the Federal Communications Commission ("FCC") to define cellular license areas and which consists of Metropolitan Statistical Areas ("MSAs") and Rural Service Areas ("RSAs").

C. "Divestiture Assets" means each mobile wireless telecommunications services business to be divested under this Final Judgment, including all types of assets, tangible and

intangible, used by defendants in the operation of the mobile wireless telecommunications

services businesses to be divested. "Divestiture Assets" shall be construed broadly to accomplish

the complete divestiture of the entire business of RCC in each of the following CMA license

areas as required by this Final Judgment and to ensure that the divested mobile wireless

telecommunications services businesses remain viable, ongoing businesses:

> (1) Burlington, VT MSA (CMA 248);
>
> (2) New York RSA 2 (CMA 560);
>
> (3) Vermont RSA 1 (CMA 679);
>
> (4) Vermont RSA 2 (CMA 680);
>
> (5) Washington RSA 2 (CMA 694); and
>
> (6) Washington RSA 3 (CMA 695)

provided that defendants may retain all of the PCS spectrum licenses RCC currently holds in

each of these CMAs, except in the Burlington MSA, and equipment that is used only for wireless

transmissions over this PCS spectrum. Defendants may also retain the Ericsson AXE 810 switch

located in Colchester, VT used to support the GSM mobile wireless telecommunications services

currently provided by RCC; the Lucent 5E switch located in Colchester, VT used to support

CDMA, TDMA and analog mobile wireless telecommunications services currently provided by

RCC; the CDMA, TDMA and analog equipment on the radio tower located at Woodstock

(latitude 43.613975, longitude -72.52175) and any associated rights for this equipment to remain

on this tower currently owned and held by RCC; and the CDMA equipment located on the radio

tower located at Stratton (latitude 43.11344, longitude -72.90691) and any associated rights for

this equipment to remain on this tower currently owned and held by RCC.  In addition,

3

defendants also (i) may retain in the Burlington MSA, RCC's PCS spectrum license, and (ii) in

the Vermont RSA 2-B2 service area, which includes Bennington and Windham counties, and the

portion of Windsor county south of U.S. Route 4, may substitute a license for 10 MHz of RCC's

cellular spectrum for RCC's 10 MHz PCS spectrum license, if approved by plaintiff United

States in its sole discretion, upon consultation with plaintiff Vermont.

The Divestiture Assets shall include, without limitation, all types of real and personal

property, monies and financial instruments, equipment, inventory, office furniture, fixed assets

and furnishings, supplies and materials, contracts, agreements, leases, commitments, spectrum

licenses issued by the FCC and all other licenses, permits and authorizations, operational support

systems, cell sites, network infrastructure, switches, customer support and billing systems,

interfaces with other service providers, business and customer records and information, customer

contracts, customer lists, credit records, accounts, and historic and current business plans that

relate primarily to the wireless businesses being divested, as well as any patents, licenses, sub-

licenses, trade secrets, know-how, drawings, blueprints, designs, technical and quality

specifications and protocols, quality assurance and control procedures, manuals and other

technical information defendant RCC supplies to its own employees, customers, suppliers,

agents, or licensees, and trademarks, trade names and service marks or other intellectual property,

including all intellectual property rights under third-party licenses that are capable of being

transferred to the Acquirer(s) either in their entirety, for assets described in (a) below, or through

a license obtained through or from RCC, for assets described in (b) below; provided that

defendants shall only be required to divest Multi-line Business Customer contracts if the primary

business address for that customer is located within any of the six license areas described herein,

4

and further, any subscriber who obtains mobile wireless telecommunications services through any such contract retained by defendants and who are located within the six license areas identified above, shall be given the option to terminate their relationship with defendants, without financial cost, at any time within one year of the closing of the Transaction. Defendants shall provide written notice to these subscribers within 45 days after the closing of the Transaction of the option to terminate.

The divestiture of the Divestiture Assets shall be accomplished by:

(a)     transferring to the Acquirer(s) the complete ownership and/or other rights to the assets (other than those assets used substantially in the operations of RCC's overall wireless telecommunications services business that must be retained to continue the existing operations of the wireless properties that defendants are not required to divest, and that either are not capable of being divided between the divested wireless telecommunications services businesses and those not divested, or are assets that the defendants and the Acquirer(s) agree, subject to the approval of plaintiff United States, shall not be divided); and

(b)     granting to the Acquirer(s) an option to obtain a nonexclusive, transferable license from defendants for a reasonable period, subject to the approval of plaintiff United States, and at the election of the Acquirer(s), to use any of RCC's retained assets under paragraph (a) above used in operating the mobile wireless telecommunications services businesses being divested, so as to enable the Acquirer(s) to continue to operate the divested mobile

5

wireless telecommunications services businesses without impairment.

Defendants shall identify in a schedule submitted to plaintiff United States

and filed with the Court as expeditiously as possible following the filing of

the Complaint, and in any event prior to any divestiture and before the

approval by the Court of this Final Judgment, any and all intellectual

property rights under third-party licenses that are used by the mobile

wireless telecommunications services businesses being divested that

defendants could not transfer to the Acquirer(s) entirely or by license

without third-party consent, the specific reasons why such consent is

necessary, and how such consent would be obtained for each asset.

D. "Multi-line Business Customer" means a corporate or business customer that

contracts with RCC for mobile wireless telecommunications services to provide multiple

telephones to its employees or members whose services are provided pursuant to a contract with

the corporate or business customer.

E. "RCC" means defendant Rural Cellular Corporation, a Minnesota corporation with its

headquarters in Alexandria, Minnesota, its successors and assigns, and its subsidiaries, divisions,

groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents,

and employees.

F. "Transaction" means the Agreement and Plan of Merger, dated July 29, 2007.

G. "Verizon" means defendant Verizon Communications Inc., a Delaware corporation,

with its headquarters in New York, New York, its successors and assigns, and its subsidiaries,

6

divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

### III. Applicability

A. This Final Judgment applies to defendants Verizon and RCC, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. If, prior to complying with Section IV and V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the acquirer(s) of the assets divested pursuant to this Final Judgment.

### IV. Divestitures

A. Defendants are ordered and directed, within 120 days after consummation of the Transaction, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer or Acquirers acceptable to plaintiff United States in its sole discretion, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, or, if applicable, to a Divestiture Trustee designated pursuant to Section V of this Final Judgment. Plaintiff United States, in its sole discretion, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, may agree to one or more

7

extensions of this time period not to exceed 60 calendar days in total, and shall notify the Court

in such circumstances. With respect to divestiture of the Divestiture Assets by defendants or the

Divestiture Trustee, if applications have been filed or are on file with the FCC within the period

permitted for divestiture seeking approval to assign or transfer licenses to the Acquirer(s) of the

Divestiture Assets, but an order or other dispositive action by the FCC on such applications has

not been issued before the end of the period permitted for divestiture, the period shall be

extended with respect to divestiture of those Divestiture Assets for which FCC approval has not

been issued until five (5) days after such approval is received. Defendants agree to use their best

efforts to accomplish the divestitures set forth in this Final Judgment and to seek all necessary

regulatory approvals as expeditiously as possible. This Final Judgment does not limit the FCC's

exercise of its regulatory powers and process with respect to the Divestiture Assets.

Authorization by the FCC to conduct the divestiture of a Divestiture Asset in a particular manner

will not modify any of the requirements of this decree.

B. In accomplishing the divestitures ordered by this Final Judgment, defendants shall

promptly make known, if they have not already done so, by usual and customary means, the

availability of the Divestiture Assets. Defendants shall inform any person making inquiry

regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to

this Final Judgment and provide that person with a copy of this Final Judgment. Defendants

shall offer to furnish to all prospective Acquirers, subject to customary confidentiality

assurances, all information and documents relating to the Divestiture Assets customarily

provided in a due diligence process except such information or documents subject to the

attorney-client or work product privileges. Defendants shall make available such information to

8

plaintiffs at the same time that such information is made available to any other person. Notwithstanding the provisions of this paragraph, with the consent of plaintiff United States in its sole discretion, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, the defendants may enter into exclusive negotiations to sell the Divestiture Assets and may limit their obligations under this paragraph to the provision of information to a single potential buyer for the duration of those negotiations.

C. Defendants shall provide the Acquirer(s) and plaintiffs information relating to the personnel involved in the operation, development, and sale or license of the Divestiture Assets to enable the Acquirer(s) to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer(s) to employ any defendant employee whose primary responsibility is the operation, development, or sale or license of the Divestiture Assets.

D. Defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, and other documents and information customarily provided as part of a due diligence process.

E. Defendants shall warrant to the Acquirer(s) that (1) the Divestiture Assets will be operational on the date of sale, and (2) every wireless spectrum license is in full force and effect on the date of sale.

F. Defendants shall not take any action that will impede in any way the permitting, licensing, operation, or divestiture of the Divestiture Assets.

G. Defendants shall warrant to the Acquirer(s) of the Divestiture Assets that there are no material defects in the environmental, zoning, licensing or other permits pertaining to the operation of each asset and that following the sale of the Divestiture Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, licensing or other permits relating to the operation of the Divestiture Assets.

H. Unless plaintiff United States, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, otherwise consents in writing, the divestitures pursuant to Section IV, or by a Divestiture Trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy plaintiff United States in its sole discretion that these assets can and will be used by the Acquirer(s) as part of a viable, ongoing business engaged in the provision of mobile wireless telecommunications services. The Divestiture Assets in Vermont and New York shall all be divested to a single Acquirer and the Divestiture Assets in Washington shall all be divested to a single Acquirer, provided that it is demonstrated to the sole satisfaction of plaintiff United States, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestiture of the Divestiture Assets, whether pursuant to Section IV or Section V of this Final Judgment,

(1)     shall be made to an Acquirer or Acquirers that, in plaintiff United States's sole judgment, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) of

10

competing effectively in the provision of mobile wireless telecommunications services; and

(2)    shall be accomplished so as to satisfy plaintiff United States in its sole discretion, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, that none of the terms of any agreement between an Acquirer(s) and defendants shall give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere with the ability of the Acquirer to compete effectively.

I. At the option of the Acquirer(s) of the Divestiture Assets, defendants shall enter into a contract for transition services customarily provided in connection with the sale of a business providing mobile wireless telecommunications services or intellectual property licensing sufficient to meet all or part of the needs of the Acquirer(s) for a period of up to one year. The terms and conditions of any contractual arrangement meant to satisfy this provision must be reasonably related to market conditions.

J. To the extent that the Divestiture Assets use intellectual property, as required to be identified by Section II.C, that cannot be transferred or assigned without the consent of the licensor or other third parties, defendants shall use their best efforts to obtain those consents.

## V.  Appointment of Divestiture Trustee

A. If defendants have not divested the Divestiture Assets within the time period specified in Section IV.A, defendants shall notify plaintiff United States, and with respect to the

11

Divestiture Assets located in Vermont notify plaintiff Vermont of that fact in writing, specifically identifying the Divestiture Assets that have not been divested. Upon application of plaintiff United States, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, the Court shall appoint a Divestiture Trustee selected by plaintiff United States and approved by the Court to effect the divestiture of the Divestiture Assets. The Divestiture Trustee will have all the rights and responsibilities of the Management Trustee who may be appointed pursuant to the Preservation of Assets Stipulation and Order, and will be responsible for:

    (1)    accomplishing divestiture of all Divestiture Assets transferred to the Divestiture Trustee from defendants, in accordance with the terms of this Final Judgment, to an Acquirer(s) approved by plaintiff United States, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, under Section IV.A of this Final Judgment; and

    (2)    exercising the responsibilities of the licensee of any transferred Divestiture Assets and controlling and operating any transferred Divestiture Assets, to ensure that the businesses remain ongoing, economically viable competitors in the provision of mobile wireless telecommunications services in the license areas specified in Section II.C, until they are divested to an Acquirer(s), and the Divestiture Trustee shall agree to be bound by this Final Judgment.

    B. Defendants shall submit a proposed trust agreement ("Trust Agreement") to plaintiff United States, which must be consistent with the terms of this Final Judgment and which must

receive approval by plaintiff United States in its sole discretion, and with respect to the

Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, who shall

communicate to defendants within 10 business days its approval or disapproval of the proposed

Trust Agreement, and which must be executed by the defendants and the Divestiture Trustee

within five business days after approval by plaintiff United States.

C.   After obtaining any necessary approvals from the FCC for the assignment of the

licenses of the Divestiture Assets to the Divestiture Trustee, defendants shall irrevocably divest

the remaining Divestiture Assets to the Divestiture Trustee, who will own such assets (or own the

stock of the entity owning such assets, if divestiture is to be effected by the creation of such an

entity for sale to Acquirer) and control such assets, subject to the terms of the approved Trust

Agreement.

D.   After the appointment of a Divestiture Trustee becomes effective, only the Divestiture

Trustee shall have the right to sell the Divestiture Assets.  The Divestiture Trustee shall have the

power and authority to accomplish the divestiture to an Acquirer(s) acceptable to plaintiff United

States, in its sole judgment, and with respect to the Divestiture Assets located in Vermont upon

consultation with plaintiff Vermont, at such price and on such terms as are then obtainable upon

reasonable effort by the Divestiture Trustee, subject to the provisions of Sections IV, V, and VI

of this Final Judgment, and shall have such other powers as this Court deems appropriate.

Subject to Section V.G of this Final Judgment, the Divestiture Trustee may hire at the cost and

expense of defendants the Management Trustee appointed pursuant to the Preservation of Assets

Stipulation and Order and any investment bankers, attorneys or other agents, who shall be solely

13

accountable to the Divestiture Trustee, reasonably necessary in the Divestiture Trustee's judgment to assist in the divestiture.

E. In addition, notwithstanding any provision to the contrary, plaintiff United States, in its sole discretion, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, may require defendants to include additional assets, or with the written approval of plaintiff United States, allow defendants to substitute substantially similar assets, which substantially relate to the Divestiture Assets to be divested by the Divestiture Trustee to facilitate prompt divestiture to an acceptable Acquirer(s).

F. Defendants shall not object to a sale by the Divestiture Trustee on any ground other than the Divestiture Trustee's malfeasance. Any such objections by defendants must be conveyed in writing to plaintiff United States and the Divestiture Trustee within 10 calendar days after the Divestiture Trustee has provided the notice required under Section VI.

G. The Divestiture Trustee shall serve at the cost and expense of defendants, on such terms and conditions as plaintiff United States approves, and shall account for all monies derived from the sale of the assets sold by the Divestiture Trustee and all costs and expenses so incurred. After approval by the Court of the Divestiture Trustee's accounting, including fees for its services and those of any professionals and agents retained by the Divestiture Trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the Divestiture Trustee and any professionals and agents retained by the Divestiture Trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the Divestiture Trustee with an incentive based on the price and

14

terms of the divestiture, and the speed with which it is accomplished, but timeliness is paramount.

H. Defendants shall use their best efforts to assist the Divestiture Trustee in accomplishing the required divestitures, including their best efforts to effect all necessary regulatory approvals. The Divestiture Trustee and any consultants, accountants, attorneys, and other persons retained by the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities of the businesses to be divested, and defendants shall develop financial and other information relevant to the assets to be divested as the Divestiture Trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the Divestiture Trustee's accomplishment of the divestitures.

I. After its appointment, the Divestiture Trustee shall file monthly reports with plaintiff United States, and with respect to the Divestiture Assets located in Vermont with plaintiff Vermont, and the Court setting forth the Divestiture Trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The Divestiture Trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

15

J. If the Divestiture Trustee has not accomplished the divestitures ordered under the Final Judgment within six months after its appointment, the Divestiture Trustee shall promptly file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish the required divestitures, (2) the reasons, in the Divestiture Trustee's judgment, why the required divestitures have not been accomplished, and (3) the Divestiture Trustee's recommendations. To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court. The Divestiture Trustee shall at the same time furnish such report to plaintiff United States, and with respect to the Divestiture Assets located in Vermont to plaintiff Vermont, who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the Divestiture Trustee's appointment by a period requested by plaintiff United States, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont.

K. After defendants transfer the Divestiture Assets to the Divestiture Trustee, and until those Divestiture Assets have been divested to an Acquirer or Acquirers approved by plaintiff United States pursuant to Sections IV.A and IV.H, the Divestiture Trustee shall have sole and complete authority to manage and operate the Divestiture Assets and to exercise the responsibilities of the licensee and shall not be subject to any control or direction by defendants. Defendants shall not use, or retain any economic interest in, the Divestiture Assets transferred to the Divestiture Trustee, apart from the right to receive the proceeds of the sale or other disposition of the Divestiture Assets.

L. The Divestiture Trustee shall operate the Divestiture Assets consistent with the Preservation of Assets Stipulation and Order and this Final Judgment, with control over operations, marketing, and sales. Defendants shall not attempt to influence the business decisions of the Divestiture Trustee concerning the operation and management of the Divestiture Assets, and shall not communicate with the Divestiture Trustee concerning divestiture of the Divestiture Assets or take any action to influence, interfere with, or impede the Divestiture Trustee's accomplishment of the divestitures required by this Final Judgment, except that defendants may communicate with the Divestiture Trustee to the extent necessary for defendants to comply with this Final Judgment and to provide the Divestiture Trustee, if requested to do so, with whatever resources or cooperation may be required to complete divestiture of the Divestiture Assets and to carry out the requirements of the Preservation of Assets Stipulation and Order and this Final Judgment. Except as provided in this Final Judgment and the Preservation of Assets Stipulation and Order, in no event shall defendants provide to, or receive from, the Divestiture Trustee or the mobile wireless telecommunications services businesses any non-public or competitively sensitive marketing, sales, pricing or other information relating to their respective mobile wireless telecommunications services businesses.

## VI. Notice of Proposed Divestitures

A. Within the later of two (2) business days following (i) the execution of a definitive divestiture agreement, or (ii) the filing of the Complaint in this action, defendants or the Divestiture Trustee, whichever is then responsible for effecting the divestitures required herein, shall notify plaintiff United States, and with respect to the Divestiture Assets located in Vermont

17

defendants shall notify plaintiff Vermont, in writing of any proposed divestiture required by Section IV or V of this Final Judgment. If the Divestiture Trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B. Within fifteen (15) calendar days of receipt of notice by plaintiff United States and plaintiff Vermont, if notice was given to plaintiff Vermont, plaintiff United States and plaintiff Vermont if it received notice, may request from defendants, the proposed Acquirer, any other third party, or the Divestiture Trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendants and the Divestiture Trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after plaintiff United States and plaintiff Vermont have been provided the additional information requested from defendants, the proposed Acquirer, any third party, and the Divestiture Trustee, whichever is later, plaintiff United States, and with respect to the Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, shall provide written notice to defendants and the Divestiture Trustee, if there is one, stating whether or not it objects to the proposed divestiture. If plaintiff United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V.F of this Final Judgment. Absent written notice that plaintiff United States does

not object to the proposed Acquirer or upon objection by plaintiff United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V.F, a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. **Financing**

Defendants shall not finance all or any part of any divestiture made pursuant to Section IV or V of this Final Judgment.

## VIII. **Preservation of Assets**

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Preservation of Assets Stipulation and Order entered by this Court and cease use of the Divestiture Assets during the period that the Divestiture Assets are managed by the Management Trustee. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## IX. **Affidavits**

A. Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or V, defendants shall deliver to plaintiffs an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who during the preceding thirty (30)

calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by plaintiff United States, and with respect to Divestiture Assets located in Vermont upon consultation with plaintiff Vermont, to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to plaintiffs an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to plaintiffs an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C. Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

## X. **Compliance Inspection**

A.  For the purposes of determining or securing compliance with this Final Judgment or whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, authorized representatives of the United States Department of Justice (including consultants and other persons retained by plaintiff United States) shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

(1)  access during defendants' office hours to inspect and copy, or at plaintiff United States's option, to require defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

(2)  to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

B.  Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

21

C.  No information or documents obtained by the means provided in this section shall be divulged by plaintiff United States to any person other than an authorized representative of the executive branch of plaintiff United States or, pursuant to a customary protective order or waiver of confidentiality by defendants, the FCC, except in the course of legal proceedings to which plaintiff United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.  If at the time information or documents are furnished by defendants to plaintiff United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then plaintiff United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.  No Reacquisition

Defendants may not reacquire or lease any part of the Divestiture Assets during the term of this Final Judgment.

## XII.  Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out

or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII.  **Expiration of Final Judgment**

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV.  **Public Interest  Determination**

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and plaintiff United States's responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

**Date:**  _____

Court approval subject to procedures of Antitrust
Procedures and Penalties Act, 15 U.S.C. § 16

_____
**United States District Judge**

23